## UNITED STATES DISTRICT COURT
## FOR THE DISTRCT OF KANSAS

| | |
|---|---|
| TRACI BRANNON, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>            v.<br><br>CVS HEALTH CORPORATION, CAREMARK RX, INC., CAREMARK RX, L.L.C., EXPRESS SCRIPTS HOLDING COMPANY, EXPRESS SCRIPTS, INC., UNITEDHEALTH GROUP, INC., OPTUMRX, INC., and PRIME THERAPEUTICS, LLC<br><br>        Defendants. | CASE NO. 17-CV-2464 |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................. 2

        A.      Plaintiff .................................................................................................. 2

        B.      Defendants ............................................................................................. 2

III.    JURISDICTION AND VENUE ......................................................................... 6

IV.     FACTUAL ALLEGATIONS ............................................................................. 7

        A.      Allergies, Anaphylaxis, and Epinephrine ............................................. 7

        B.      The Development of Epinephrine Injectors and Mylan's
                Acquisition of the EpiPen ..................................................................... 9

        C.      Mylan's Relentless EpiPen Price Increases ....................................... 11

        D.      The Role of Pharmacy Benefit Managers (PBMs) in the
                Pharmaceutical Industry and Prescription Drug Prices ..................... 13

        E.      Pharmacy Benefit Managers and the Epinephrine Auto-injector
                Market .................................................................................................. 17

        F.      Mylan's Testimony and Statements Regarding Payments to PBMs ................. 20

        G.      The Cost to Consumers in the EpiPen Auto-injector Supply Chain ................. 26

V.      ERISA ALLEGATIONS .................................................................................. 30

        A.      The PBM Defendants Are Fiduciaries and Parties in Interest. ........................... 30

        B.      The PBM Defendants' ERISA Duties. ................................................ 39

        C.      The PBM Defendants Breached Their Duties. .................................... 43

VI.     TOLLING THE STATUTE OF LIMITATIONS .............................................. 46

        A.      Plaintiff and the Classes are Entitled to Tolling Due to Fraud or
                Concealment ........................................................................................ 46

        B.      Estoppel................................................................................................ 48

VII.     CLASS ACTION ALLEGATIONS ................................................................... 48

VIII.    CLAIMS FOR RELIEF ................................................................................... 53

COUNT I — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER
         INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C.
         §1961, ET SEQ. ................................................................................... 53

         A.     Description of Defendants' RICO Enterprise ..................................... 54

         B.     The Development of the RICO Enterprise ......................................... 56

         C.     The Conduct of the RICO Enterprise and its Members ..................... 57

         D.     Predicate Acts: Mail and Wire Fraud ............................................... 62

         E.     Damages Caused by the RICO Enterprise ......................................... 67

COUNT II — PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)
         FOR VIOLATIONS OF ERISA § 406(b), 29 U.S.C. § 1106(b) ................... 68

COUNT III — PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) FOR
         VIOLATIONS OF ERISA § 404, 29 U.S.C. § 1104 ..................................... 71

COUNT IV — PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
         FOR VIOLATIONS OF ERISA § 702, 29 U.S.C. § 1182 ............................. 73

IX.      DEMAND FOR JUDGMENT ........................................................................ 76

X.       JURY DEMAND ........................................................................................... 78

## I.    INTRODUCTION

1.    Plaintiff Traci Brannon, by and through her undersigned attorneys, brings this action individually and on behalf of all others similarly situated against Defendants CVS Health Corporation, Caremark Rx, Inc., Caremark Rx, L.L.C. (together, "CVS Health"), Express Scripts Holding Company, Express Scripts, Inc. (together, "Express Scripts"), UnitedHealth Group, Inc. ("UnitedHealth"), OptumRx, Inc. ("OptumRx"), and Prime Therapeutics LLC ("Prime" or "Prime Therapeutics") (collectively, "Defendants") to recover hundreds of millions of dollars improperly paid to Defendants as a result of the creation, maintenance, and concealment of a multi-tiered fraudulent scheme designed to deceive consumers through the marketing and sale of the EpiPen epinephrine injector (the "EpiPen").[1]  The EpiPen is a life-saving device used to treat and prevent anaphylaxis associated with certain severe allergic reactions. The EpiPen is manufactured and sold by Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. (collectively, "Mylan").

2.    As more fully described below, Defendants' scheme, which served to artificially inflate the cost of the EpiPen by more than 500% in order to facilitate Mylan's payment of so-called "rebates," fees, or other payments to CVS Health, Express Scripts, OptumRx, and Prime (the "PBM Defendants") in exchange for favorable formulary placement, constitutes a breach of Defendants' fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") and a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

3.    Plaintiff's allegations are based on her own experience and personal knowledge, research, the research of counsel, publicly available articles, studies, reports, and other sources, a reasonable inquiry under the circumstances, and on information and belief. Plaintiff's allegations

---

[1] For simplicity, this Complaint uses the term "EpiPen" to refer to the EpiPen®, EpiPen 2-Pak®, EpiPen Jr.®, EpiPen Jr. 2-Pak®, My EpiPen®, LIFE HAPPENS®, EpiPen4Schools®, Never-See-Needle®, and Be Prepared® (collectively or individually, the "EpiPen").

are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery arising out of this matter and other related cases proceeding against Mylan N.V. and its subsidiaries proceeding in this District.[2]

## II.    PARTIES

### A.    Plaintiff

4.    **Plaintiff Traci Brannon** is a resident of Oklahoma and has needed to purchase EpiPen products, specifically the EpiPen Jr. 2-Pak, for the treatment of her child's allergies for years. Plaintiff Brannon most recently purchased an EpiPen Jr. 2-Pak from CVS Pharmacy #06010 on January 18, 2016, where she paid a $30.00 co-pay.

5.    Plaintiff Brannon is and, for all relevant time periods, has been enrolled in an employer-provided welfare benefit health plan governed by ERISA through BlueCross BlueShield of Oklahoma for which Defendant Prime Therapeutics, LLC administers pharmacy benefits. Plaintiff Brannon used BlueCross BlueShield of Oklahoma's prescription drug benefit administered by Defendant Prime Therapeutics, LLC to make the EpiPen epinephrine injector purchases described above.

### B.    Defendants

6.    **Defendant Prime Therapeutics, LLC** is a corporation organized under the laws of Delaware and headquartered at 1305 Corporate Center Drive, Eagan, Minnesota, 55121. Prime Therapeutics, LLC is a pharmacy benefit manager ("PBM") and, as such, contracts on behalf of health plans and insurers with Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. for the purchase of EpiPen epinephrine injectors. Prime Therapeutics, LLC provides

---

[2] *See In Re: EpiPen Auto-Injection Litigation*, No. 2:16-02711-DDC-KGG (2016).

comprehensive prescription benefit management services to more than 20 million plan participants.

7.     Prime Therapeutics is registered to do business in Kansas,[3] and maintains substantial contacts in this State where it operates as the Pharmacy Benefit Manager for Blue Cross and Blue Shield of Kansas.[4]

8.     **Defendant CVS Health Corporation** is a corporation organized under the laws of Delaware and headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895. CVS Health is a pharmacy benefit manager ("PBM") and, as such, contracts on behalf of health plans and insurers with Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. for the purchase of EpiPen epinephrine injectors. CVS Health Corporation provides comprehensive prescription benefit management services to over 2,000 health plans, including corporations, managed care organizations, insurance companies, unions and government entities, and covers 65 million lives.[5]

9.     **Defendant Caremark Rx, Inc.** is a corporation organized under the laws of Delaware and headquartered at 211 Commerce Street, Suite 800, Nashville, Tennessee, 37201. Caremark Rx, Inc. is an immediate or indirect parent of many subsidiaries, including pharmacy benefit management subsidiaries, and a subsidiary of Defendant CVS Health Corporation.

---

[3] Kansas Business Center, *Business Entity Search – Prime Therapeutics LLC*, https://www.kansas.gov/bess/flow/main?execution=e1s5 (last accessed 08/09/17).

[4] Prime Therapeutics, *Media Resources – Clients*, https://www.primetherapeutics.com/en/news/Resources/clients.html (last accessed: 08/09/17).

[5] Ed Kaplan & Wendy Pongracz, *Negotiating and Drafting Pharmacy Benefit Manager Contracts for Self-Insured Plans*, Strafford (June 21, 2016). http://media.straffordpub.com/products/negotiating-and-drafting-pharmacy-benefit-managercontracts-for-self-funded-plans-2016-06-21/presentation.pdf.

Collectively, Defendant CVS Health Corporation, Defendant Caremark Rx, L.L.C. and Defendant Caremark Rx, Inc. are referred to as "CVS Health."

10.    CVS Health maintains substantial contacts in Kansas, including offices located in Shawnee Mission, Kansas.

11.    **Defendant Express Scripts Holding Company** is a Delaware corporation. Its principal place of business is at 1 Express Way, St. Louis, Missouri, 63121.

12.    **Defendant Express Scripts, Inc.** is a corporation organized under the laws of Delaware and headquartered at 1 Express Way, St. Louis, Missouri, 63121. Express Scripts is a pharmacy benefit manager ("PBM") and, as such, contracts on behalf of health plans and insurers with Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. for the purchase of EpiPen epinephrine injectors. As the largest pharmacy benefit management organization in the United States, Defendant Express Scripts Inc. covers 79 million lives[6] and the company reported $96.5 billion in revenue in 2016.[7] Defendant Express Scripts, Inc. is a subsidiary of Defendant Express Scripts Holding Company. Defendant Express Scripts, Inc., and Defendant Express Scripts Holding Company collectively are referred to as "Express Scripts."

13.    Express Scripts maintains substantial contacts in Kansas, including offices located in Overland Park, Kansas.

14.    **Defendant UnitedHealth Group, Inc.** ("UnitedHealth") is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343. UnitedHealth is a diversified managed healthcare company. In 2015, UnitedHealth Group reported

---

[6] Ed Kaplan & Wendy Pongracz, *Negotiating and Drafting Pharmacy Benefit Manager Contracts for Self-Insured Plans*, Strafford (June 21, 2016), http://media.straffordpub.com/products/negotiating-and-drafting-pharmacy-benefit-managercontracts-for-self-funded-plans-2016-06-21/presentation.pdf.
[7] Express Scripts Holding Company, Annual Report (Form 10-K) (Dec. 31, 2016).

revenue in excess of $157 billion, and the company is currently ranked sixth on the Fortune 500 list. UnitedHealth offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its pharmacy benefit manager ("PBM"): OptumRx.

15.     **Defendant OptumRx, Inc.** is a corporation organized under the laws of California and headquartered at 2300 Main St., Irvine, California, 92614. OptumRx is a pharmacy benefit manager ("PBM") and, as such, contracts on behalf of health plans and insurers with Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. for the purchase of EpiPen epinephrine injectors. As one of the largest pharmacy benefit management companies in the United States, OptumRx covers 65 million lives[8] and reported approximately $48.2 billion in revenue in 2015; and over $60.44 billion in 2016.[9]

16.     OptumRx is registered to do business in Kansas[10] and maintains the headquarters for its mail-order service in Overland Park, Kansas which houses nearly 2,000 employees.[11]

17.     Together, CVS Health, Express Scripts, OptumRx, and Prime Therapeutics LLC are referred to herein as the "PBM Defendants." This complaint specifically addresses the actions of the PBM Defendants and neither Mylan N.V. nor its subsidiaries are parties to this action. Although the PBM Defendants engaged in the activities complained of herein in concert with

---

[8] Ed Kaplan & Wendy Pongracz, *Negotiating and Drafting Pharmacy Benefit Manager Contracts for Self-Insured Plans*, Strafford (June 21, 2016), http://media.straffordpub.com/products/negotiating-and-drafting-pharmacy-benefit-managercontracts-for-self-funded-plans-2016-06-21/presentation.pdf.

[9] UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2016).

[10] Kansas Business Center, *Business Entity Search*, https://www.kansas.gov/bess/flow/main?execution=e2s5 (last accessed 08/09/2017).

[11] Kansas Department of Commerce, *OptumRx Announces Job Growth for Overland Park Facility* (Dec. 21, 2011), http://www.kansascommerce.com/CivicAlerts.aspx?AID=355

Mylan N.V. and its subsidiaries, claims against those entities are presently addressed in another matter already proceeding in this District,[12] which obviated the need to include them here.

### III.    JURISDICTION AND VENUE

18.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. Further, 29 U.S.C. § 1132(e)(1) confers subject matter jurisdiction on this Court over claims brought under Title I of ERISA.

19.    **Personal Jurisdiction.** The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district. ERISA § 502(e)(2) and 29 U.S.C. § 1132(e)(2) provide for nationwide service of process. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in this State.

20.    **Venue.** Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in the District of Kansas, and because some of the actions giving rise to the complaint took place within this District. Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because most Defendants reside or may be found in this District and some or all of the fiduciary

---

[12] *See In Re: EpiPen Auto-Injector Litigation*, No. 2:16-02711-DDC-KGG (2016).

breaches or other violations for which relief is sought occurred in or originated in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## IV.  FACTUAL ALLEGATIONS

### A.  Allergies, Anaphylaxis, and Epinephrine

21.    Anaphylaxis is a severe life-threatening allergic reaction that can occur rapidly after exposure to an allergen. Anaphylaxis manifests in a variety of symptoms, including swelling of the tongue and throat, vomiting, reduced blood pressure, difficulty breathing, and if untreated, death.

22.    Food allergens are the most common triggers of anaphylaxis, but medications, latex, and insect bites can also cause anaphylaxis. A food allergy occurs when the body's immune system mistakenly identifies a food protein as a threat and attacks it. According to Food Allergy Research & Education—an allergy advocacy and research group—approximately 15 million people have food allergies in the United States and one out of every thirteen children in the United States has serious food allergies, the most common of which include everyday items like peanuts, milk, soy, wheat, and shellfish.[13]

23.    Around 200,000 Americans suffer anaphylaxis annually, and it is considered a life-threatening medical emergency.[14]

---

[13] Food Allergy Research & Education, *Facts and Statistics* (2017), https://www.foodallergy.org/facts-and-stats.
[14] *Id.*

24.     Epinephrine, also known as adrenaline, is a medication used for emergency treatment of severe allergic reactions, including anaphylaxis. Epinephrine is also used to treat anaphylaxis caused by exercise or unknown substances. It is available only by prescription.

25.     Epinephrine is very effective at treating anaphylaxis, but it must be administered immediately. A delay in receiving epinephrine of as little as 30 minutes can result in death.

26.     In the vast majority of cases, an epinephrine auto-injector is the most effective device for quickly administering epinephrine. As shown in the below diagram, an auto-injector device injects epinephrine into a muscle through the device's spring-loaded needle.[15]



Rev 1 EpiPen® Complete Device



Rev 1 EpiPen® Part Breakdown



1. Housing
2. Sleeve
3. Cartridge and Stopper
4. Stopper Driver
5. Plunger (formed of two laser cut brass sheet parts)
6. Drive Spring
7. Release Collar
8. Thrust washer
9. Rear Collar
10. Safety Cap

---

[15] Ben Popken, *Mylan's Upgraded EpiPen Torn Apart By Experts*, NBC NEWS (Sept. 20, 2016), http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651, (last visited Jan. 31, 2017).

27.     Patients prone to anaphylaxis are advised to carry an epinephrine auto-injector at all times to be used in an emergency where they are at risk of having a severe allergic reaction. In short, epinephrine auto-injectors save lives.

**B.     The Development of Epinephrine Injectors and Mylan's Acquisition of the EpiPen**

28.     The auto-injector device was first developed by Survival Technology, Inc. in the 1970s to administer a nerve agent antidote for the United States military. This original auto-injector was called the ComboPen. It was subsequently modified to deliver epinephrine, thus creating the EpiPen.[16]

29.     The United States Food and Drug Administration approved the EpiPen on December 22, 1987, under New Drug Application 019430.

30.     In 1996, Survival Technology, Inc. merged with Meridian Medical Technologies,[17] which one year later sold the exclusive right to market and distribute the EpiPen to Dey LP. Dey LP is a subsidiary of Merck KGaA, a German multinational pharmaceutical company.[18]

31.     Mylan acquired Dey LP and the right to market and distribute the EpiPen line of epinephrine auto-injector devices from Merck as part of broader 2007 acquisition deal.[19]

---

[16] Matt Reimann, *The Story of the EpiPen: From Military Technology to Drug-Industry Cash Cow,* TIMELINE (Aug. 20, 2016), https://timeline.com/epipen-technology-drug-industryb28d19036dee#.seg6n7dls, (last visited Jan. 31, 2017).
[17] Meridian Medical Technologies 10-K Filing (Jul. 31, 1997).
[18] Marilyn Case, *EpiPen Recall Points to Broader Concerns*, WALL ST. J. (May, 10, 1998), http://www.wsj.com/articles/SB895440623631960000, (last visited Jan. 31, 2017).
[19] Tara Parker-Pope & Rachel Rabkin Peachman, *EpiPen Price Rise Sparks Concern for Allergy Sufferers*, N.Y. TIMES (Aug. 22, 2016), http://well.blogs.nytimes.com/2016/08/22/epipen-price-risesparks-concern-for-allergy-sufferers/, (last visited Jan. 31, 2017).

32.    According to Mylan, the EpiPen "is used in the treatment of severe allergic reactions" and "is an epinephrine auto-injector that has been sold in the U.S. and internationally since the mid-1980s."[20]

33.    The EpiPen provides a 0.3 mg dose of epinephrine, while the EpiPen Jr. contains a 0.15 mg dose. EpiPens have a one-year expiration period and patients are advised to replace them after their expiration date. The EpiPen Jr., for kids, has a retail price that is the same as the EpiPen, despite containing half the medicine (0.15 mg instead of 0.3mg) of the EpiPen. Mylan itself states that food allergies among U.S. children are "on the rise, now affecting one in 13" kids.[21]

34.    Mylan has worldwide rights to the EpiPen auto-injector, which is supplied to Mylan by a wholly owned subsidiary of Pfizer, Inc.

35.    The EpiPen is the most popular epinephrine injection device with nearly 4 million prescriptions written last year alone.

36.    The number of patients filling a prescription for an EpiPen has grown 67 percent over the past seven years. "[F]or doctors, who write prescriptions for the name they know best, the EpiPen brand 'is like Kleenex,' says Robert Wood, a pediatric allergist at Johns Hopkins University School of Medicine."[22]

---

[20] MYLAN N.V. 10-K (2015), https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231x doc.htm, (last visited Jan. 31, 2017).

[21] *Mylan Applauds New Federal Legislation to Increase Anaphylaxis Preparedness in Schools*, MYLAN INC. (Nov. 14, 2013), http://newsroom.mylan.com/press-releases?item=123181, (last visited Jan. 31, 2017).

[22] Cynthia Koons and Robert Langreth, *How Marketing Turned the EpiPen Into a Billion-Dollar Busines*s, BLOOMBERG (Sep. 23, 2015), http://www.bloomberg.com/news/articles/2015-09-23/how-marketingturned- the-epipen-into-a-billion-dollar-business, (last visited Jan. 31, 2017).

37.    By 2015, Mylan gained at least an 85% market share (and likely higher) of the epinephrine injector market. Mylan's price hikes have left an untold number of children and adults vulnerable to dying from an allergic reaction.

## C.    Mylan's Relentless EpiPen Price Increases

38.    When Mylan first acquired the EpiPen in 2007, it was priced at approximately $57 per EpiPen or a little over $100 for two.

39.    Since late 2009, Mylan has raised the price of the EpiPen 15 times.

40.    On October 12, 2009, Mylan raised the price of two EpiPens to $124.

41.    In 2010, Mylan stopped selling single EpiPens in the United States. Instead, Mylan began requiring the EpiPen be purchased in two-packs (the "EpiPen 2-Pak"), which doubled the price consumers must pay, even if they need only one EpiPen.

42.    In October 2011, two years and four price increases later, Mylan increased the price of an EpiPen 2-Pak to $181.

43.    After four more price increases, by July 17, 2013, an EpiPen 2-Pak cost $265.

44.    Three more price increases raised the price of an EpiPen 2-Pak to $401 in November 2014.

45.    Mylan continued to hike the price of the EpiPen 2-Pak throughout 2015 and into 2016.

46.    As of May 2016, an EpiPen 2-Pak cost around $608.

47.    The jump in the price orchestrated by Mylan is depicted in the graphic below:



48.    According to Kevin Deane, head of medical technologies for PA Consulting Group (a global technology and design firm that sold a drug delivery technology company to Pfizer in 2004), however, these increased prices cannot be explained by increased costs or new developments in technology: "the base components for each EpiPen, including the plastic cap, tube, and needle, might cost between $2 to $4 to purchase."[23]  And the EpiPen contains "essentially [the] same core technology that [has been] there for many years."[24]

49.    In fact, two engineering industry experts peg the total cost of making an EpiPen 2-Pak at between $8.02 and $10.03, and that "even include[s] the bright-yellow box," indicating that the price of EpiPens in the United States has become completely untethered to their production cost.[25]

---

[23] Ben Popken, *Industry Insiders Estimate EpiPen Costs No More Than $30*, NBC NEWS (Sep. 6, 2016), http://www.nbcnews.com/business/consumer/industry-insiders-estimate-epipen-costs-no-more-30-n642091, (last visited Jan. 31, 2017).

[24] *Id.*

[25] Tracy Seipel, *EpiPen Outrage: Silicon Valley Engineers Figure Real Cost to Make Lifesaving Auto-Injector Two-Pack — about $8*, Mercury News (Oct. 1, 2016), http://www.mercurynews.com/2016/10/01/epipen-outrage-silicon-valley-engineers-figure-true-cost-tomake-lifesaving-auto-injector-about-10/, (last visited Jan. 31, 2017).

50.     To fully explain these extreme increases in price, it is necessary to consider a number of other non-market forces, including radical changes that have taken place in the pharmaceutical industry and the relatively recent rise in influence of insurance industry middle-men known as Pharmacy Benefit Managers ("PBMs").

## D.    The Role of Pharmacy Benefit Managers (PBMs) in the Pharmaceutical Industry and Prescription Drug Prices

51.     The supply chain for prescribed medical products in the United States consists of four major actors: Manufacturers, Wholesale Distributors, Pharmacies, and Pharmacy Benefit Managers (PBMs).

52.     Prescription medical products "originate in manufacturing sites; are transferred to wholesale distributors; are stocked at retail, mail-order, and other types of pharmacies; are subject to price negotiations and processed through quality and utilization management screens by PBMs; are dispensed by pharmacies; and ultimately are delivered to and taken by patients."[26]

53.     The technical function of a PBM is to administer a health coverage provider's prescription benefit program. A PBM develops the coverage provider's formulary (the list of prescription benefits included in coverage at various pricing "tiers"), processes claims, creates a network of retail pharmacies that provide discounts in exchange for access to a provider's plan participants, and negotiates with manufacturers. Formularies include prescription drugs, such as EpiPen epinephrine injectors.

54.     Often, PBMs are also responsible for performing drug utilization reviews and operating their own mail-order, specialty, and retail pharmacies. PBMs also contract with a

---

[26] Health Strategies Consultancy LLC, *Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain*, THE KAISER FAMILY FOUNDATION (Mar. 2005), https://kaiserfamilyfoundation.files.wordpress.com/2013/01/follow-the-pillunderstanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf.

network of retail and community pharmacies. Pharmacies agree to dispense prescription products to covered patients. The contract provides for a payment rate for each prescription, plus a dispensing fee. Pharmacies are also responsible for collecting patient cost-sharing payments and sending those to the PBM or reducing the PBM's or plan's share owed by that amount.

55.    In addition, and of particular significance here, PBMs have contractual relationships with medical product manufacturers. PBMs negotiate rebates, fees, and other concessions with the manufacturers. These relationships allow PBMs to exert tremendous influence and control over what products are made available to health plans and insureds.

56.    The following chart[27] illustrates the prescription supply chain, and the PBMs' central role in it:



57.    When they first came into existence in the late 1960s, PBMs provided administrative services to health plans by processing claims and maintaining formularies. Over time, they played a larger role negotiating prices with manufacturers of prescription products.

---

[27] Joseph Walker, *Drugmakers Point Finger at Middlemen for Rising Drug Prices*, WALL ST. J. (Oct. 3, 2016, 12:43 PM), https://www.wsj.com/articles/drugmakers-point-fingerat-middlemen-for-rising-drug-prices-1475443336.

Since PBMs were independent, they generally were thought to pass savings back to health plans and consumers by using their leverage to negotiate lower reimbursement rates with pharmacies and discounts with manufacturers.[28]

58.    In the 1990s, manufacturers began acquiring PBMs, which caused an "egregious conflict[] of interest," prompting the Federal Trade Commission to undo those deals.[29] The deals allowed prescription product manufacturers to coordinate pricing policies, see their competitors' sensitive pricing information, and favor their own products over those of their competitors.[30]

59.    In the early and late 2000s, PBMs started buying pharmacies, which has caused a similar conflict of interest that resulted from the merger of manufacturers and PBMs in the 1990s. When a PBM combines with a pharmacy, they "lose the incentive to police against pharmaceutical company schemes to steer patients to more expensive drugs. Indeed, they may collude in them."[31] The power of the largest PBMs has continued to grow, and has allowed them to distort the pharmaceutical supply chain to their own financial advantage.

60.    Manufacturers well understand the power of PBMs.[32] Because of their size, and the many thousands of health plan clients they represent, PBMs can steer business from one manufacturer to another based on which one pays the larger PBM Kickback.

---

[28] Brian Feldman, *Big pharmacies are dismantling the industry that keeps US drug costs even sort-of under control*, QUARTZ (Mar. 17, 2016), https://qz.com/636823/bigpharmacies-are-dismantling-the-industry-that-keeps-us-drug-costs-even-sort-of-undercontrol/.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Denise Roland & Peter Loftus, *Insulin Prices Soar While Drugmakers' Share Stays Flat*, WALL ST. J., (Oct. 7, 2016, 5:46 PM), https://www.wsj.com/articles/insulin-pricessoar-while-drugmakers-share-stays-flat-1475876764.

61.    PBMs make outsized profits by exploiting the United States' complex prescription distribution system. While the role of PBMs in the supply chain is well known, the size of the rebates and other fees they extract from companies for formulary placement, and the portion of these payments they pocket (the "PBM Kickbacks") are carefully guarded secrets.[33]

62.    PBMs depend on the lack of transparency to conduct their business and have vigorously resisted any requirement that they disclose the details of their agreements with manufacturers, and the PBM Kickbacks they receive from manufacturers—as well as their agreements with the insurers and pharmacies.[34]

63.    Although consumers are led to believe that the list price is the actual price for a prescribed product, such as EpiPens, the list price is inflated to account for PBM Kickbacks, some of which are "rebated" back to the PBMs, as shown in the following diagram. Note that the diagram is only illustrative and that insurers or other payers do not necessarily receive a large proportion of the "rebates" back from PBMs, which may keep all or most of the payments in some instances. "Overall, nearly one-third of the total expenditures on branded pharmaceuticals were, in some way, rebated back to PBMs and payers in 2015."[35]  Further, the below diagram does not account for other payments—kickbacks that are not labeled a "rebate" or that may be wholly hidden from view of other parties to the transaction, including consumers and other payers.

---

[33] *See, e.g.*, Lydia Ramsey, *One of the largest middlemen in the drug industry just released a video showing why it should be able to remain secretive*, BUSINESS INSIDER (Feb. 9, 2017), http://www.businessinsider.com/what-pharmacy-benefit-managers-aredoing-about-trump-and-drug-pricing-2017-2.

[34] *Id.*

[35] Wayne Winegarden, *The Economic Costs of Pharmacy Benefit Managers: A Review of the Literature*, Pacific Research Institute (May 2017), at 5.



### E. Pharmacy Benefit Managers and the Epinephrine Auto-injector Market

64.     PBMs serve as both middlemen and gatekeepers between drug and medical supply manufacturers on the one hand, and health insurers and patients on the other. For the PBMs, business is booming. Combined, the three largest PBMs in the United States—OptumRx, ExpressScripts, and CVS Caremark—report more than $200 billion a year in revenue.[36] They

---

[36] Kasia Lipska, *Break Up the Insulin Racket*, N.Y. TIMES (Feb. 20, 2016), https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html.

control close to 80% of the industry, administering and managing pharmacy benefits for over 180 million insureds.[37]

65.     PBMs are supposed to negotiate *lower* prices for their clients, health insurers and plan administrators. Using the sheer volume of their clients as leverage, the PBM Defendants set up exclusionary tiered formularies—ranked lists of drugs, such as epinephrine injectors, where some cheaper and more effective products are supposed to be placed into lower tiers, generally with lower cost-sharing amounts due from patients.

66.     Plan administrators and health insurers rely on PBMs' formularies to calculate how much of their insureds' costs for formulary products they will cover. Medical products that are in the lower, preferred, formulary tiers should be cheaper for health plan members.

67.     PBMs are the gatekeepers of formularies—they can decide to exclude entirely a drug like the EpiPen if they do not receive what they view as favorable terms from the manufacturer. This gives the PBM enormous control over purchasing and leverage over manufacturers.

68.     If two medical products are basically interchangeable, a PBM sometimes will exclude from its formulary the more expensive version—again, supposedly based on the price of the product for consumers.

69.     Health plans that use a PBM's formulary either will not reimburse members for the purchase price of products that are excluded from the formulary or will require members to pay a larger coinsurance amount based on the list price rather than the actual net price that the PBM paid. Thus, exclusionary formularies allow PBMs, like the PBM Defendants, to push patients toward certain brands over others, or even exclude certain brands entirely.

---

[37] *Id.*

70.     While PBMs could use this market power to drive down the prices for medical products by forcing manufacturers to lower the list price, instead they and manufacturers have figured out a way to game the system for their mutual benefit. To gain formulary access, manufacturers like Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. have inflated their list prices and then "rebate" or kick back a significant portion of the list price to the PBMs. The rebates are provided under a variety of labels—discounts, credits, concession fees, etc.[38] Regardless of the term used to describe them, they are a *quid pro quo* for formulary inclusion or preferential placement. The result of this rebating scheme is a vast difference between the list price reported by manufacturers and the net price obtained by the manufacturers after PBMs have taken their rebates.  And even though manufacturers may not keep the entirety of the list prices they inflate to make room for kickbacks to PBMs, they too profit from the scheme—formulary inclusion translates into increased sales volumes, and increases in list price benefit the manufacturer's bottom line as well as the PBMs.

71.     PBMs may pass a portion of "rebates" to their major insurer clients, some of which are owned by or affiliated with them, and pocket the rest, along with other payments with different labels. The higher the rebate or other payments, the more the PBMs can pocket. The total amount and nature of the payments, the amount that the PBM pockets, and the amount that passes through to payers are concealed from insureds and the public.

72.     This rebate scheme creates the best of both worlds for the Defendants, at the expense of consumers like Plaintiff Brannon. Defendants obtain large payments from the manufacturers in exchange for granting access to the exclusionary formularies, increasing the PBM

---

[38] *See, e.g.*, Linda Cahn, *Don't Get Trapped By PBMs' Rebate Labeling Games*, MANAGED CARE (Jan. 2009), https://www.managedcaremag.com/archives/2009/1/don-tget-trapped-pbms-rebate-labeling-games.

take, and manufacturers like Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc.
pay rebates without diminishing—and, at times, even increasing—their profits because their net
profits are protected by the ever-increasing list prices, and sales are ensured through formulary
placement. In this way, consumers subsidize not only Mylan's increased profits, which are
collected through the ever-increasing cost of the EpiPen set by Mylan itself, but also the kickbacks
paid to the PBM Defendants which are charged to consumers, by Mylan, on top of its already
exorbitant prices.

73.    The result of this scheme is a wide gap between the price paid by PBMs for
epinephrine auto-injectors (*i.e.*, the net realized price actually received by the manufacturer), and
the publicly available manufacturer list price that directly impacts what consumers must pay.

## F.    Mylan's Testimony and Statements Regarding Payments to PBMs

74.    Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. ("Mylan")
have made no secret of their role in this scheme. In fact, when Mylan CEO Heather Bresch was
called to testify to a Congressional committee investigating the high price of the EpiPen, she
expressly admitted that Mylan's payment of rebates and other "allowances"—whatever those
are—to PBMs has directly contributed to the sky-rocking price of the EpiPen.

75.    As she indicated in the below-pictured chart: "Bresch said that for every $608
EpiPen two-pack, Mylan receives $274. The remaining $334 go to other players in the supply
chain – middle men, including pharmacy benefit managers, or PBMs."[39]

---

[39] CBS News, *MylnCEO on EpiPen drug price controversy: "I get the outrage"* (Jan. 27, 2017),
http://www.cbsnews.com/newsepipen-price-hike-controversy-mylan-ceo-heather-bresch-speaks-out.pdf.



76.    Going further, Bresch herself points fingers at the PBM Defendant "middlemen" to explain the exorbitant price of EpiPens: "Bresch asserted [that] Mylan had little choice but to jack up the EpiPen list price to accommodate the middlemen's demands for rebates and fees."[40] And she alleged that blaming manufacturers like Mylan for high drugs costs is unfair: "the only face that you see on that medicine is the pharmaceutical manufacturer," Bresch said. "Where in reality. . . .there's at least five entities touching that product,"[41] including PBMs as indicated in the below chart[42] also prepared by Mylan:

---

[40] Michael Hiltzik, *How 'price-cutting' middlemen are making crucial drugs vastly more expensive*, L.A. TIMES (June 9, 2017), http://www.latimes.combusiness/hiltzik/la-fi-hiltzik-pbm-drugs-20170611-story.html.

[41] *Id.*

[42] Mylan, *The Entire Economic Story of the U.S. Pharmaceutical Supply Chain* (2017), http://www.mylan.com/-/media/mylancom/images/featured_stories/supply-chain.jpg.





77.    And in the below-excerpted portion of an interview with CNBC, Ms. Bresch reiterated Mylan's position:

> Bresch: So look, no one's more frustrated than me. I've been in this business for 25 years.
>
> Brian Sullivan (CNBC): But you're the one raising the price, though. How can you be frustrated?
>
> Bresch: My frustration is there's a list price of $608. There is a system. There are – I laid out that there are four or five hands that the product touches and companies that it goes through before it ever gets to that patient at the counter. No one-everyone should be frustrated. I am hoping that this is an inflection point for this county. Our health care is in a crisis. It's no different than the mortgage crisis back in 2007. This bubble is going to burst.[43]

78.    PBMs tout their market power and ability to drive down prices for prescription products, like EpiPens. They boast about the "rebates" or "discounts" for which they bargain with

---

[43] CNBC, *First on CNBC: CNBC Transcript: Mylan CEO Heather Bresch Sits Down with CNBC's Brian Sullivan Today on "Squawk Box"* (Aug. 25, 2016), www.cnbc.com/2016/08/25/first-on-cnbc-cnbc-transcript-mylan-ceo-heather-bresch-sits-down-with-cnbcs-brian -sullivan-today-on-squawk-box.html.

manufacturers, like Mylan. The story they tell is that these rebates and discounts are obtained for the benefit of patients since they purportedly result in *lower* costs. In their latest Form 10-K filed with the United States Securities Exchange Commission, for example, Defendant OptumRx reported that its PBM business helped "improve overall health system performance through optimizing care quality, reducing costs and improving consumer experience. . . ."[44] Similarly, Express Scripts claims, "[w]e put medicine within reach of patients while helping health benefit providers improve access to prescription drugs and make them more affordable. . . ."[45] And CVS Health Corp. contends, "[w]e assist our clients in designing pharmacy benefit plans that help minimize the costs to the client while helping improve health outcomes . . . ."[46]

79.    But the story that OptumRx and other PBM Defendants tell is far from the whole truth. They obtain rebates and discounts, but neglect to reveal their large kickbacks—the portion of the manufacturers' payments that they pocket. They also neglect to reveal that their formulary decisions are based on the amount of the spread they obtain from the rebate paid by manufacturers. And they neglect to reveal that the consequence of this scheme is higher costs for patients, whose payments at the pharmacy point of sale are calculated based on the unrebated list price of medical products, not the lower price paid by the PBMs after all rebates and other financial benefits received by the PBMs from the manufacturers and other third parties are taken into account.[47] Indeed, PBMs, such as the PBM Defendants, misrepresent the role they play in the supply chain, and their impact on the prices actually paid by consumers. PBMs are avaricious gatekeepers, with

---

[44] UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2016).

[45] Express Scripts Holding Company, Annual Report (Form 10-K) (Dec. 31, 2016).

[46] CVS Health Corporation (Form 10-K) (Feb. 5, 2017).

[47] Denise Roland & Peter Loftus, *Insulin Prices Soar While Drugmakers' Share Stays Flat*, WALL ST. J., (Oct. 7, 2016, 5:46 PM), https://www.wsj.com/articles/insulin-pricessoar-while-drugmakers-share-stays-flat-1475876764.

a stranglehold on the medical supply chain. Their scheme to sell formulary access for rebates drives up the cost of prescription drugs and other medical products for the people who need to use them to stay alive.

80.     Despite Bresch's claims regarding the role that PBMs plan in drug pricing, manufacturers like Mylan are no less at fault. Their conduct deprives patients of a fair price for epinephrine auto-injectors—a price that would result from the operation of normal market forces. Mylan maintains the ability to sell EpiPen products to the millions of Americans who depend on them, without having to lower the "real," net prices to gain market share via formulary inclusion. Instead, they bargain for that market share by providing ever-larger rebates and other kickbacks to PBMs and entering into exclusive relationships with those PBMs, inflating the prices paid by consumers for EpiPens in order to preserve their net realized price and sales volumes.[48]

81.     In fact, Mylan's scheme has inflated costs throughout the entire auto-injector market. In order to keep up with the rebates offered by Mylan, when competitors are able to introduce products into the market, they are forced to price their products at similarly high rates. For example, when Kaleo introduced the Auvi-Q auto-injector in 2017 it was priced at whopping $4,500 for a two-pack. But, according to Kaleo Chief Executive Spencer Williamson, this price is due, in part, to the effect of rebates indicating that "nobody . . . will pay $4,500" and "[t]he reason the list price is high is it's the only way we can make sure patients have access and can get it for $0."[49]

---

[48] *Id.*

[49] Meg Tirrell, *EpiPen Competitor Auvi-Q Comes Back Feb. 14 With a Pricing Scheme That Will Blow Your Mind* (Jan. 19, 2017), https://www.cnbc.com/2017/01/19/epipen-competitor-auvi-q-comes-back-feb-14.html.

82.    According to industry analyst Ronny Gal and Michal Rea, CEO of Rx Savings Solutions, who commented on the Auvi-Q pricing announcement: "We've seen this pricing mechanism before. It's the same game with a new drug."; "The entire game is to charge an enormous amount of money to insurers and have those insurers cross-subsidize everybody else."[50]

83.    This is, indeed, nothing new. As indicated in the below chart,[51] the history of EpiPen and Auvi-Q pricing indicates only ever-increasing list prices designed to pay higher and higher rebates to ensure formulary access:



84.    In contrast, auto-injector products that are traditionally excluded from formulary placement and distribute directly to retailers have been able to avoid these inflationary effects on

---

[50] *Id.*

[51] *Id.*

price. For example, a little-known alternative to the EpiPen known as Adrenaclick, is sold at Walmart for as little as $142.[52]

## G.    The Cost to Consumers in the EpiPen Auto-injector Supply Chain

85.    Defendants' scheme to make increasing profits from EpiPen epinephrine injectors has had a devastating effect on the lives of real people. Unlike PBMs, insurers, pharmacies, health plans, and patients are directly subjected, by PBMs, to the list price artificially set by manufacturers, like Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. The Commissioner of the FDA, Dr. Scott Gottlieb, explained how this harms consumers:

> [The rebates] don't necessarily help offset the costs paid by those who need a particular drug. . . . [I]f a patient needs a particular drug, they will increasingly find that they are paying the full, negotiated price at the pharmacy counter. They never see the real "net" price, after the rebate is applied much later. The rebate is paid to the health plan, not the patient buying the drug.[53]

Further, aside from any rebates that are passed through to plans or payers, PBMs collect substantial additional payments that are not passed through—they are pocketed by the PBMs—and may not even be disclosed to their payer clients, much less the participants and beneficiaries to whom they owe fiduciary duties. The manner and extent of the impact of price on patients depends on how patients get their prescriptions, but there is a formula for them all. They fit into the following categories:

86.    **Uninsured.** First, uninsured consumers—because they are completely outside of the PBMs' and manufacturers' web of PBM Kickback financing arrangements through health plans—must pay the full list price for EpiPens. This is not a small population. Although the

---

[52] Yasmin Tayag, *Adrenaclick Is the Not-So-Secret EpiPen Substitute* (Aug. 25, 2016), https://www.inverse.com/article/20200-adrenaclick-epipen-mylan-alternative-substitute-cheaper.

[53] Wayne Winegarden, *The Economic Costs of Pharmacy Benefit Managers: A Review of the Literature*, Pacific Research Institute (May 2017), at 5.

coverage rates have increased significantly lately, by the end of 2015 there were still 28.5 million nonelderly Americans who lacked insurance.[54]

87.    **Deductibles**. Second, consumers who are in health plans suffer directly from the inflated price of EpiPens when they pay their deductibles. The deductible is the amount that an insured must pay before insurance benefits will contribute to medical and pharmacy expenses. Thus, until the deductible is met, an insured must pay out of pocket. Depending on the plan, consumers may be required to pay the full list price of drugs and other medical needs.

88.    Moreover, deductibles are rising, meaning that insured consumers are having to pay more out of pocket for medical needs, including EpiPens. The Kaiser Family Foundation found that in 2016, "deductibles rose 12% in the market group and four times faster than premiums increased."[55] The higher the deductible, the more consumers have to pay full price for their prescriptions until their coverage begins.

89.    "Almost a quarter of all people obtaining insurance through employers are now enrolled in high-deductible-health plans ("HDHPs"), up from 4% in 2006. The average deductible amount has increased 67% since 2010. And almost half of workers are covered by insurance with annual deductibles of at least $1,000 for individual coverage."[56] With the surge in popularity of

---

[54] *Key Facts about the Uninsured Population*, THE KAISER FAMILY FOUNDATION (Sept. 29, 2016), http://kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/.

[55] Drew Altman, *The Missing Debate Over Rising Health-Care Deductibles*, THE KAISER FAMILY FOUNDATION (Sept. 18, 2016), http://kff.org/health-costs/perspective/themissing-debate-over-rising-health-care-deductibles/.

[56] *Don't Be Fooled By Eli Lilly's & Express Scripts' New Insulin Program*, NATIONAL PRESCRIPTION COVERAGE ASSOCIATION (2017), http://nationalprescriptioncoveragecoalition.com/dont-be-fooled-by-eli-lillys-expressscripts-new-insulin-program/.

"high-deductible" plans among employer-sponsored health plans, deductible thresholds affect an ever-increasing number of patients, as indicated below:



90.    High deductible plans require consumers to pay thousands of dollars before their coverage kicks in. Many individuals and families cannot afford to hit their high-deductible costs year after year. As a result, rising list prices for drugs and other prescription products are particularly harmful to patients in high-deductible plans, not only because they hit their deductibles annually, but because they hit their deductibles over a *shorter period of time*, resulting in significant financial burden at the start of each calendar year.

91.    **Cost sharing.** Third, even after deductibles are paid, insured consumers' prescription costs are still affected by the PBMs' and manufacturers' pricing scheme through copayments and coinsurance requirements. Some plans require these payments during the deductible phase, while others require payment of the full list price with copayments and coinsurance requirements only after the deductible is met.

92.    Copayments are set amounts that an insured must pay for medical services, including prescriptions. Copayments vary by the prescribed product, with products in preferred formulary positions carrying a lower copay and products in a disfavored position costing the insured more. For example, if EpiPens are moved to a less preferred tier on a PBM's formulary, a

patient then must spend more because of that less favorable formulary placement, which is driven by Defendants' pricing scheme.

93.     Coinsurance is a percentage of the cost of a medical service or prescription product that the insured must pay. In the case of prescription products, the coinsurance amount is based on the inflated list price, not an adjusted price based on the secret rebates and kickbacks that PBMs negotiate, and not the amount that manufacturers actually collect or the PBMs actually pay.

94.     To add insult to injury, the portion of prescription costs that an insured person's plan will pay is often not based on the full, inflated list price—it is based on a negotiated lower price, which will take into account some rebates, discounts, or other concessions passed through to the plan by the PBM. Thus, plans with such arrangements do not simply pay the difference between the participant's payment and the list price—they instead pay something less—and for large insurers or those that own PBMs, something much less. The burden on participants and beneficiaries of such plans is disproportionate to whatever percentages they may think they are shouldering.

95.     People with severe allergies who rely on EpiPens to prevent and treat allergy-induced anaphylaxis are the victims of the Defendants' scheme. These patients are burdened with exorbitant out-of-pocket expenses for their treatment because their payment obligations are based on the list prices, not the opaque net prices provided to PBMs. This is so regardless of whether these patients are uninsured and paying the entire list price or whether they are insured and paying large deductibles, coinsurance, or high-tier copayments. All of these patients are making payments based on the inflated list price.

96.     This lawsuit alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and breached their fiduciary duties imposed by the Employee

Retirement Income Security Act of 1974 ("ERISA"), by engaging in extortion, a RICO enterprise, and deceptive conduct, whose purpose is to unlawfully extract ever-larger portions of rebates and other payments—"PBM Kickbacks"—from Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc.

97.     Plaintiff further alleges that Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. have provided the PBM Defendants with increasingly larger kickbacks by inflating their list prices, and have further conspired to prevent disclosure of net prices to consumers—also in violation of the aforementioned laws. Defendants' scheme directly and foreseeably causes consumers to overpay for these life-saving medications. Thus, this action is brought to redress Plaintiff's injuries that flow from Defendants' scheme—which has driven up the cost of prescription drugs—and in particular EpiPen epinephrine injectors—to the substantial benefit of the PBM Defendants, Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc.—and to obtain prospective injunctive relief to curtail Defendants' practices and provide greater transparency in pricing, as well as lower prices going forward. The causes of action asserted herein allow, *inter alia*, the remedies of monetary damages, damage multipliers, restitution, injunctive relief, and other equitable relief.

## V.     ERISA ALLEGATIONS

### A.     Prime Therapeutics LLC is a Fiduciary and Party in Interest.

98.     Plaintiff and the members of the ERISA Class (as defined below) are participants in employee welfare benefit plans, as that term is defined in 29 U.S.C. § 1002(1)(A), whose pharmacy benefits covering prescription medications are administered by Prime Therapeutics LLC ("ERISA Plans").

99.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

100.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

101.     Prime Therapeutics LLC is a fiduciary of all of the ERISA Class members' ERISA Plans for which it administered prescription drug benefits in that it exercised discretionary authority or control respecting the following plan management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that it had discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the ERISA Class, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because, by way of example, it did and/or could do one or more of the following with respect to the ERISA Plans:

A.      negotiate with drug manufacturers for the inclusion of the drugs they manufacture on its formularies that govern prescription drug coverage through the ERISA Plans;

B.      negotiate with drug manufacturers the prices that patients and the ERISA Plans will pay, including through placement of specific drugs on its tiered formularies;

C.      dictate whether a particular drug was covered, and if so, in which tier it was categorized;

D.      dictate the prices of prescription drugs to patients and ERISA Plans;

E.      negotiate with drug manufacturers the amount of rebates, discounts, fees, or other financial incentive payments (*i.e.*, PBM Kickbacks, as defined above) that it will receive from drug manufacturers upon the purchase of specific drugs by patients and health plans;

F.      induce drug manufacturers to artificially inflate the list prices so that there is room enough in the drug pricing regime for the PBM Kickbacks, while drug manufacturers' net profits and sales volumes are buoyed by their drugs' inclusion on PBM formularies;

G.      dictate the portion, if any, of the PBM Kickbacks that are shared with or passed through to other entities, such as health insurers, plan administrators, plan sponsors, or patients;

H.      dictate the amount ultimately paid to pharmacies for prescription drugs;

I.      dictate the amount pharmacies charge patients for prescription drugs;

J.      manage the prescription drug benefit program, including processing and paying prescription drug claims received from pharmacies;

K.      choose whether to fill a prescription from a participant, reject the prescription, or shift the participant to a different prescription medication or require the use of exclusive mail order pharmacies;

L.      determine the amount of and require the collection of additional profits and compensation for services provided by Prime Therapeutics pursuant to and in managing or administering the ERISA Plans;

M.      set its own margin/compensation for services performed as a fiduciary by dictating the amount of PBM Kickbacks it will collect from drug manufacturers and the amount of such PBM Kickbacks it will ultimately keep for itself in connection with prescription drug purchases;

N.      unilaterally collect its own compensation for services performed as a fiduciary by collecting PBM Kickbacks;

O.      set and change the compensation of itself with respect to the ERISA Plans by allocating the proceeds of PBM Kickbacks;

P.      misrepresent, conceal, and/or fail to disclose to patients and other fiduciaries the manner in which it charged for prescription drugs as alleged above;

Q.      misrepresent, conceal, and/or fail to disclose to patients and to other fiduciaries the amounts and components of PBM Kickbacks that it collects from drug manufacturers like Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc.;

R.      misrepresent, conceal, and/or fail to disclose to patients and to other fiduciaries its compensation and profit collected in connection with prescription drug transactions—*i.e.*, the amount it keeps for itself;

S.      improperly trade off the interests of ERISA Plan participants and beneficiaries for its own benefit in charging inflated prices to obtain excessive profits at the expense of participants and others paying amounts that are captured as PBM Kickbacks;

T.      improperly trade off the interests of plan participants and beneficiaries for the benefit of third parties, including drug manufacturers like Mylan, who are able to sell more of the drugs they produce as a result of their participation in the pricing scheme described herein;

U.      improperly trade off the interests of plan participants and beneficiaries for the benefit of third parties, including drug manufacturers, who are able to sell the drugs they produce at a higher price as a result of their participation in the pricing scheme described herein; and

V.      leverage its contractual relationships with ERISA Plans, their insurers and administrators, and the pharmacies from which the ERISA Plans and their participants and beneficiaries purchase prescription drugs to exert control over billions of dollars that flow from prescription drug purchases by ERISA Plans and their participants and beneficiaries, as well as over the ERISA Plan instruments that govern these transactions, as described further below, causing Plan participants to pay inflated prices for EpiPen auto-injectors and other drugs.

102.    The PBM Kickbacks are possible because of Prime's discretion and power to do the foregoing, which makes it's a fiduciary to the ERISA Plans. Prime's *relationships with* and *access to* the ERISA Plans and related prescription drug purchases are the source of this discretion and power. Prime has and uses its discretion and authority to set its own fees and compensation by virtue of its role with respect to the administration and/or management of the ERISA Plans—a

central part of which is and was negotiating drug prices from which Prime extract a significant cut of rebates and other payments from drug manufacturers while increasing, rather than decreasing, costs to ERISA Plan participants. Thus Prime's fiduciary power is, in part, the power over its own fees and compensation, because its fees and compensation flow from the drug price negotiations *only it* has the power to conduct on behalf of the ERISA Plans. The fees and compensation Prime extracts from these negotiations performed on behalf of the ERISA Plans are achieved at the substantial expense of the ERISA Plans' participants and beneficiaries, who must pay purchase prices that result from the inflated list prices that are central to and caused by the Defendants' pricing scheme.

103.    Further, the PBM Kickbacks were additional compensation for the administration and/or management of prescription drug coverage that was collected by Prime that was neither disclosed to nor agreed to by the participants and beneficiaries or others that were required to make these additional payments so that participants and beneficiaries could receive their covered prescription drugs. Prime had and exercised discretion to determine the amount of and require the payment of this additional undisclosed compensation, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

104.    The PBM Kickbacks are an additional "premium" within the meaning of ERISA § 702, for the provision of prescription drug coverage that was collected by Prime that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional contributions to receive their covered prescription drugs. Prime had and exercised discretion to determine the amount of and require the payment of this additional undisclosed premium payment, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

105.     In addition to its fiduciary status under the foregoing provisions, Prime is a fiduciary of all of the ERISA Class members' ERISA Plans in that it exercised *any* authority or control respecting the management or disposition of plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because:

A.     The copayments, coinsurance, and deductible payments that Prime required pharmacies to collect from participants and beneficiaries are "plan assets" within the meaning of ERISA;

B.     The contracts (*e.g.*, insurance policies and administrative-services-only ("ASO") contracts) underpinning the plans are "plan assets" within the meaning of ERISA; and

C.     Through the pricing scheme, as described above, Prime exercised control over both (i) drug payments from participants and beneficiaries and (ii) the contracts underpinning the ERISA Plans. Prime successfully leveraged its relationships to the ERISA Class members' ERISA Plans to benefit itself and third parties, and its authority or control over significant plan assets and relationships with the ERISA Plans enabled it to do so. Through this scheme, Prime caused participants to pay inflated prices for EpiPen epinephrine injectors.

106.     In addition, any plan-paid amounts that were contributed to participant prescription drug transactions were "plan assets" within the meaning of ERISA. Prime also exercised control over these plan assets, part of which became PBM Kickbacks, making Prime a fiduciary for purposes of these transactions.

107.     Prime is able to pervert its ostensible role as the entity that will drive drug prices down—and instead induce the drug manufacturers to raise prices on prescription medications to

allow for PBM Kickbacks—because it has and exercises control over both ERISA Plans and ERISA plan assets. Prime's access to the ERISA Plans and ERISA plan assets is used as leverage in its negotiations with drug manufacturers. But for Prime's access to millions of insureds' prescription drug transactions and the funds used to purchase drugs for plan participants, Prime would not be able to negotiate and extract the PBM Kickbacks. Thus, Prime leveraged its unique and powerful access to one of the most exploitable (and lucrative) plan assets that exists today— health insurance policies and ASO contracts—as well as its key relationships with and access to thousands of ERISA Plans.

108.    In addition to the conduct described herein the PBM Defendants are fiduciaries because they exercise discretion to set the prices that the members of the ERISA Class were and are required to pay for their prescription medications. PBMs are required to act in the best interests of the members of the ERISA Class, but by allowing participants and beneficiaries of ERISA Plans to be subject to the pricing scheme described herein and participating in this scheme with Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc., Prime has also breached its fiduciary duties to the ERISA Class, as described more below.

109.    Prime is aware of the effect the pricing scheme is having on the ERISA Class. Nevertheless, it has maximized and continue to maximize its revenues and the revenues of drug manufacturers at the expense of the ERISA Class by engaging in the illegal conduct described herein.

110.    Furthermore, in negotiating and entering into a contract on behalf of an ERISA plan, a fiduciary must act prudently and negotiate terms that are reasonable and in the best interests of plan participants and beneficiaries. In these negotiations and in the contract, agreement, or arrangement that is ultimately agreed upon, a fiduciary cannot place its interests over the interests

of the plan participants and beneficiaries. To the extent that Prime has negotiated agreements subject to the pricing scheme described herein, it has exercised discretionary authority and control over the ERISA Plans, their management and administration, and ERISA plan assets by setting its own margins and compensation for the sale of prescription medications through rebate and other payment negotiations with drug manufacturers. As discussed further below, this same conduct breached its fiduciary duties under ERISA and constituted prohibited transactions.

111.    In addition to being a fiduciary for the foregoing reasons, Prime is a party in interest under ERISA because (a) it is a fiduciary, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) it provided plan administration and pharmacy benefit management services to Plaintiff and the ERISA Class members' health plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

112.    As further described below, Prime—a fiduciary and party in interest—also received and used for its own and third parties' benefit "plan assets," including patients' and certain ERISA Plans' contributions to prescription drug purchases and ERISA Plan contracts under which it had access to the ERISA Plans and ERISA plan assets, and was able to impose its pricing scheme on the ERISA Class.

113.    Notably, the foregoing powers and activities confer fiduciary status on Prime for all types of ERISA Plans for which they provide pharmacy benefit services—including both insured plans and self-insured or union funded (Taft-Hartley) plans for which a health insurance company provides administrative-services-only (ASO) plan administration—because these plans all utilize PBMs in the same manner. Thus, all participants and beneficiaries in ERISA Plans of whatever type are owed fiduciary duties by Prime, and these participants and beneficiaries may bring claims for their own personal losses caused by Prime's breaches and prohibited transactions, as set forth below.

114.    As a result of Prime's misuse of its fiduciary power, ERISA Plan participants and beneficiaries are forced to finance the PBM Kickbacks, from which Prime and others profit. The PBM Kickbacks do not just enrich Prime. They do so to the detriment of Plan participants, who pay inflated prices for EpiPen autoinjectors as a result of the scheme.

## B.    Prime Therapeutic's ERISA Duties.

115.    **The Statutory Requirements**: ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

116.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty—that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

117.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

118.    **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

119.    **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a). As noted above, under ERISA, a "party in interest" includes a fiduciary as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

120.    ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

121.    ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

122.    **Co-Fiduciary Liability.** A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

123. **The Duty to Monitor.** In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

124. **The Duty Not To Discriminate**. A health insurer may not discriminate against insureds by charging excessive premiums. ERISA § 702, 29 U.S.C. § 1182, states in pertinent part:

> Prohibiting discrimination against individual participants and beneficiaries based on health status.
>
> (a) In eligibility to enroll.
>
> (1) In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:
>
> (A) Health status.
>
> (B) Medical condition (including both physical and mental illnesses).
>
> (C) Claims experience.
>
> (D) Receipt of health care.
>
> (E) Medical history.
>
> (F) Genetic information.
>
> (G) Evidence of insurability (including conditions arising out of acts of domestic violence).
>
> (H) Disability.
>
> (2) No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—
>
> (A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or

(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3) Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1) In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

125.    **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.** ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Plaintiff brings her ERISA claims pursuant to ERISA § 502(a)(3), as further set forth below.

C.    **Prime Breached its Duties.**

126.    Prime committed breaches of its fiduciary duty and prohibited transactions, and harmed Plaintiff and the ERISA Class members in the following ways:

A.  Plaintiff and the ERISA Class members were charged excessive "copayments" or "coinsurance" contributions for EpiPens as a result of the Defendants' pricing scheme, which caused the list price of the EpiPen to be artificially inflated;

B.  Through the Defendants' pricing scheme, Plaintiff and the ERISA Class members were charged unlawful fees and additional premiums for EpiPens;

C.  Plaintiff and the ERISA Class members were overcharged for copayment and coinsurance contributions in that rather than paying a percentage of an uninflated price for EpiPens or a flat fee based on an uninflated price for EpiPens; these cost-sharing payments were based on substantially inflated amounts;

D.  Plaintiff and the ERISA Class members were overcharged when making payments toward their deductibles or out-of-pocket maximums in that rather than paying an uninflated price for EpiPens, they were charged inflated amounts as a result of Defendants' pricing scheme;

E.  Prime improperly leveraged its relationships with and access to the ERISA Plans and their plan assets to extract PBM Kickbacks from drug manufacturers like Mylan;

F.  Prime discriminated against patients who require the use of EpiPens as compared to those who do not;

G.  Prime misrepresented and failed to disclose to ERISA Plan participants and beneficiaries the manner in which it charged for prescription drugs as alleged above;

H.  Prime set their own compensation for services performed as a fiduciary by inducing drug manufacturers like Mylan to inflate the list price of EpiPens to facilitate Prime's collection of PBM Kickbacks;

I.      Prime unilaterally collected their own compensation for services performed as a fiduciary by collecting PBM Kickbacks;

J.      Prime set and changed the compensation of third parties with respect to the ERISA Class members' ERISA Plans by allocating the proceeds of the PBM Kickbacks without heeding the best interests of participants and beneficiaries;

K.      Prime maximized its own profits and profits to third parties, at the expense of Plaintiff and the ERISA Class members;

L.      Prime received improper compensation from entities doing business with the ERISA Plans whose pharmacy benefits it administered and managed;

M.      Prime knew or reasonably should have known that its actions would injure plan participants and beneficiaries of all ERISA Plans whose EpiPen epinephrine injector prices they manipulated;

N.      Prime negotiated EpiPen prices and PBM Kickbacks based on disloyal and self-interested factors and made such decisions without putting the interests of participants and beneficiaries first;

O.      Prime drove up EpiPen prices instead of driving them down, in order to increase its profits and the profits of drug manufacturers like Mylan at the expense of participants and beneficiaries of the ERISA Plans; and

P.      Drug manufacturers like Mylan knowingly participated in and profit from the fiduciary breaches and prohibited transactions committed by Prime.

127.    Plaintiff and the ERISA Class members were overcharged for and/or paid unauthorized and excessive copayments, coinsurance, and deductible payments in connection with the purchase of EpiPen epinephrine injectors.

128.    Plaintiff and the ERISA Class members were harmed by an abuse of the fiduciary power that Prime possesses—a substantial part of which gives Prime discretion and authority over the administration and management of the ERISA plans with respect to prescription drug benefits and costs and their own fees and compensation. Prime's ability to wield its fiduciary power to extract from drug manufacturers like Mylan, kickbacks and other benefits for itself directly and financially harmed participants and beneficiaries of the ERISA Plans. Plaintiff and the ERISA Class members were forced to pay purchase prices for EpiPens that were based on the very same inflated list prices that facilitated Prime's profits from rebates and other kickbacks that drug manufacturers like Mylan paid in exchange for formulary placement and access to the EpiPen purchases of ERISA Plan participants and beneficiaries whose ERISA Plans Prime managed and administered. Had Mylan required drug manufacturers like Mylan to *lower* their price for formulary inclusion, participants' cost sharing amounts would have been based on lower list prices. Thus, Prime's profits derived from the Defendants' pricing scheme directly harm participants and beneficiaries who must purchase EpiPen epinephrine injectors.

## VI.    TOLLING THE STATUTE OF LIMITATIONS

**A.    Plaintiff and the Classes are Entitled to Tolling Due to Fraud or Concealment**

129.    By its nature, Defendants' pricing scheme has hidden Defendants' unlawful conduct from consumers and injured parties, and its details remain hidden.

130.    Plaintiff and the members of the Classes had no way of knowing about Defendants' scheme and deception with respect to the pricing of EpiPen epinephrine injectors, nor could they have reasonably discovered its existence until shortly before filing this action.

131.    Within the time period of any applicable statutes of limitation, Plaintiff and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Defendants were engaged in and/or concealing the conduct complained of herein

and misrepresenting the true cost of the EpiPen and the amount of PBM Kickbacks that resulted from the scheme.

132.    Plaintiff and the other members of the Classes did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendants were engaged in the pricing scheme described here and were negotiating based on phony list prices, nor would reasonable and diligent investigation have disclosed the true facts.

133.    Even today, lack of transparency in EpiPen pricing and the arrangements, relationships, and agreements between and among drug manufacturers like Mylan and the PBM Defendants that result in the PBM Kickbacks continue to hide Defendants' unlawful conduct from the members of the Classes.

134.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to all claims identified herein.

135.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action. For example, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation." And while the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the discovery of an injury, which limitation is subject to equitable tolling due to defendants' fraudulent concealment of their unlawful conduct. *See Rotella v. Wood*, 528 U.S. 549 (2000).

136.    Defendants' pricing scheme—by its nature a secret endeavor by Defendants— remains hidden from most members of the Classes. Indeed, although Defendants have admitted

that their pricing scheme has driven up prices, the precise amount of PBM Kickbacks remains information in Defendants' possession and largely a mystery to the members of the Classes. Moreover, each Defendant actively and effectively concealed its participation in the scheme from Plaintiff and the other members of the Classes through opaque practices and secrecy policies. There is no question that Plaintiff's claims are timely.

## B.    Estoppel

137.    Defendants were under a continuous duty to disclose to Plaintiff and the members of the Classes the true price that they should have been charged for EpiPens, rather than the artificially inflated list price that resulted from the Defendants' scheme, the net price paid by the PBM Defendants for EpiPens, the existence of the Defendants' scheme, and the impact that it had on Plaintiff and the Classes' payment obligations for EpiPens. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

138.    Plaintiff brings this action on behalf of herself and all others similarly situated under Federal Rule of Civil Procedure 23(a), as well as (b)(3), (b)(2), and (b)(1), as representatives of two Classes defined as follows:

> **The National Class.** All persons or entities in the United States and its territories that acquired, purchased, or paid for any portion of the end-user purchase price of an EpiPen epinephrine injector (the "Class").

The Class also includes a sub-Class, defined as follows:

> **The ERISA Class.** All individuals residing in the United States and its territories who are or were enrolled in an ERISA-covered health benefit plan or health insurance plan for which Prime Therapeutics LLC administers or manages pharmacy benefits, who purchased an EpiPen epinephrine injector pursuant to such plans or policies and were required to pay all or a portion of the purchase price based on an inflated list price (the "ERISA Class").

139.  **Class Period.** Plaintiff will seek Class certification, damages, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, under RICO, 18 U.S.C. 1961, *et seq.* and the doctrine of equitable tolling. Further, Plaintiff reserves the right to refine the Class Period after she has learned the extent of Defendants' fraud and the length of its concealment.

140.  Excluded from the Classes are: (a) the named Defendants and any entity in which they have a controlling interest, and their legal representatives, officers, directors, assignees, and successors and (b) any co-conspirators, and their officers, directors, management, employees, subsidiaries, and affiliates.

141.  This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

142.  **Numerosity.** Upon information and belief, the Classes consists of millions of purchasers residing throughout the United States. Accordingly, it would be impracticable to join all members of the Classes before the Court.

143.  **Typicality.** Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes were damaged by the same wrongful conduct of Defendants—i.e., as a result of Defendants' misconduct, these purchasers paid artificially inflated prices for EpiPen epinephrine injectors.

144.  **Adequacy.** Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Classes.

145.    Counsel that represent Plaintiff are experienced in the prosecution of Class action RICO and ERISA litigation and have particular experience with Class action litigation involving pharmaceutical products and Pharmacy Benefit Managers.

146.    **Commonality.** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to all members of the Classes, thereby making overcharge damages with respect to the Classes as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

147.    Under Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all of the members of the Classes and which predominate over any individual issues. Included within the common question of law or fact are:

A.    Whether the PBM Defendants were induced by PBM Kickbacks to place EpiPens on their formularies;

B.    Whether the PBM Defendants induced Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. to raise the list prices of the EpiPen in exchange for formulary inclusion;

C.    Whether the PBM Defendants conspired with drug manufacturers including Mylan for the purpose of carrying out the pricing and kickback scheme described herein;

D.    Whether Defendants engaged in a pattern and practice that caused Plaintiff and the members of the Classes to make inflated payments for EpiPen autoinjectors

E.    Whether Defendants engaged in deceptive and/or fraudulent conduct;

F.    Whether Defendants' marketing material and other communications distributed by Defendants was false or misleading;

G.      Whether Defendants' deceptive and/or fraudulent activity was intended to defraud or harm Plaintiff and the members of the Classes;

H.      Whether Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*

I.      Whether Defendants utilized or formed enterprises for the purpose of carrying out a scheme intended to defraud Plaintiff and the members of the Classes;

J.      Whether Defendants engaged in a pattern of racketeering;

K.      Whether Defendants used the U.S. mails and interstate wire facilities to carry out a scheme intended to defraud Plaintiff and the members of the Classes;

L.      Whether Defendants used the U.S. mails and interstate wire facilities to carry out their conspiracy and agreement.

M.      Whether Defendants' scheme, in whole or in part, has substantially affected interstate and intrastate commerce;

N.      Whether Defendants' conduct violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*,

O.      Whether Prime is a fiduciary under ERISA;

P.      Whether Prime is a party in interest under ERISA;

Q.      Whether Prime breached its fiduciary duties in failing to comply with ERISA as set forth above;

R.      Whether Prime's conduct as alleged above breached ERISA's prohibited transaction rules;

S.      Whether Prime breached ERISA § 702;

T.    Whether Plaintiff and the members of the Classes are entitled to compensatory damages and, if so, the nature of such damages;

U.    Whether Plaintiff and the members of the Classes are entitled to exemplary or punitive damages and, if so, the nature of such damages; and

V.    Whether Plaintiff and the members of the Classes are entitled to injunctive or equitable relief and, if so, the nature of that relief.

148.    Under Rule 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

149.    This action is also maintainable as a class action under Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief respecting the Classes as a whole.

150.    With respect to Rule 23(b)(1)(B), the prosecution of separate actions by each plaintiff in the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

151.    Finally, Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants.

152.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT I — VIOLATIONS OF 18 U.S.C. § 1962(C)-(D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ.*

(By Plaintiff on Behalf of all Members of the Classes, Against all Defendants)

153.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

154.    Plaintiff brings this Count on behalf of herself and the Classes against Defendants CVS Health Corporation ("CVS Health"), Caremark Rx, L.L.C., Express Scripts Holding Company, Express Scripts, Inc. ("Express Scripts"), UnitedHealth Group, Inc. ("UnitedHealth"), OptumRx, Inc. ("OptumRx"), and Prime Therapeutics LLC ("Prime" or "Prime Therapeutics LLC") (collectively, "Defendants"), for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq*.

155.    At all relevant times, the Defendants have been "persons" within the meaning of 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

156.    Plaintiff and the members of the Classes are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

157.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

158.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

159.    As explained in detail below, Defendants infiltrated the business arrangement established between the manufacturers of the EpiPen—Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. ("Mylan")—health plans, and prescription drug insurance companies across the country through a fraudulent scheme designed to secure greater profits and market share, increase the cost of the EpiPen, secure a favorable formulary position for Mylan's products including the EpiPen, and extract hundreds of millions of dollars of revenue from Plaintiff and the Classes. As explained in detail below, the Defendants' years-long misconduct violated sections 1962(c) and (d).

## A.    Description of Defendants' RICO Enterprise

160.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

161.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

162.    Defendants formed just such an association-in-fact RICO Enterprise, which consisted of the following entities and individuals: (a) CVS Health, its subsidiaries, executives, employees, and agents; (b) Express Scripts, its subsidiaries, executives, employees, and agents; (c) OptumRx, its subsidiaries, executives, employees, and agents; (d) UnitedHealth Group, Inc., its subsidiaries, executives, employees, and agents; (e) Prime Therapeutics LLC, its subsidiaries, executives, employees, and agents;  and (f) Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc., their subsidiaries, executives, employees, and agents.

163.    Alternatively, each Defendant, together with Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. ("Mylan") constitute a separate, independent, associated-in-fact enterprise.

164.    Alternatively, each of the Defendants, Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. constitute a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Defendants conducted their pattern of racketeering activity. The Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as "the RICO Enterprise."

165.    The RICO Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to secure formulary access for Mylan's EpiPen products and increasing Mylan and the Defendants' profits by fraudulently and artificially increasing the list price of those EpiPen products at the expense of Plaintiff and the Class.

166.    To accomplish this purpose, the members of the RICO Enterprise periodically and systematically inflated the list price of EpiPen products and represented—either affirmatively or

through omissions—to the general public, health care payers, and consumers, including Plaintiff and the Classes, that list prices for EpiPen products fairly and accurately reflected their actual cost.

167.    The members of the RICO Enterprise concealed from the public, health care payers, and consumers, like Plaintiff and the members of the Classes, the existence and amount of steep rebates that Mylan gave to the PBM Defendants.

168.    The members of the RICO Enterprise also concealed from the public the purpose of these rebates: to increase profits for the PBM Defendants and increase the distribution of Mylan's products through favorable formulary placement.  These large rebates served to ensure that the PBM Defendants would place, and maintain, EpiPen products on the PBM Defendants' formularies. By securing a place on the PBM Defendants' formularies, the members of the RICO Enterprise ensured that a larger number of prescriptions for EpiPen products would be written and filled. This scheme translated into higher rates of sales for Mylan and larger profits for the PBM Defendants.

**B.    The Development of the RICO Enterprise**

169.    For years, the PBM Defendants played a small but meaningful role in the prescription drug business: providing administrative services on behalf of health plans that offer prescription drug benefits and negotiating with drug manufacturers on their behalf.

170.    In the past decade, however, the PBM Defendants and other PBMs began to exert influence in their role as insurance-industry middle-men to dictate the success or failure of certain drugs in the marketplace by offering to include or threatening to exclude certain medications from some or all of their formularies and, in the process, extracting hundreds of millions of dollars in the form of 'discounts' or 'rebate' payments from drug manufacturers in exchange.

171.    Negotiations between PBMs and drug manufacturers regarding those discounts, however, take place in complex, closed-door meetings, during which PBMs sell access to their

formularies in exchange for large rebates or discounts, a substantial portion of which they pocket as pure profit.

172.    In order to facilitate the payment of 'rebates' to PBMs, and ensure their position on certain formularies without impacting their bottom line, Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. participated in a scheme with the PBM Defendants to increase the list price of EpiPen products.

173.    This scheme to increase the profits of PBMs through artificially increasing the list price of medications benefits everyone in the prescription drug industry supply chain except Plaintiff and the Classes, who are left paying fraudulently obtained, exorbitant, and ever-increasing prices for their medications, specifically the EpiPen. The practice is particularly pernicious in the case of the EpiPen because it decreases access to a life-saving emergency treatment.

174.    At all relevant times, the Defendants, Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. ("Mylan"), along with insurance companies, pharmacies, wholesalers, and other individuals and entities, including unknown third parties, operated an ongoing association-in-fact enterprise.

175.    This association-in-fact enterprise was formed for the purpose of ensuring that one or more of Mylan's EpiPen products was included on the PBM Defendants' formularies and increasing Defendants' profits by fraudulently and artificially increasing the list price of those EpiPen products at the expense of Plaintiff and the Classes, and through which the Defendants conducted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(4).

## C.    The Conduct of the RICO Enterprise and its Members

176.    While each of the Defendants and each member of the RICO Enterprise acquired, maintained control of, were associated with, and conducted or participated in the conduct of the RICO Enterprise's affairs, at all relevant times, the RICO Enterprise: (a) had an existence separate

and distinct from each Defendant and each participant; (b) was separate and distinct from the pattern of racketeering in which the Defendants and each participant in the RICO Enterprise engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. ("Mylan"), along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of ensuring that one or more of Mylan's EpiPen products were included on the PBM Defendants' formularies and increasing Mylan and the Defendants' profits by fraudulently and artificially increasing the list price of those EpiPen products at the expense of Plaintiff and the Classes.

177.    Defendants and their co-conspirators, through their illegal RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities, including Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc., by selling EpiPen products at an inflated and artificial price ("the RICO Scheme").

178.    The PBM Defendants leveraged their dominate position in the prescription drug insurance market to demand that drug manufacturers, like Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc., pay substantial kickbacks in order to have their products included or be given priority on the Defendants' formularies.

179.    Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. facilitated the RICO Scheme by agreeing to provide ever-larger 'discounts' or 'rebates' to the PBM Defendants in order to gain or maintain access to their formularies and funding those discounts by artificially increasing the list price of the EpiPen.

180.   In furtherance of the scheme, Defendants and Mylan also affirmatively misrepresented or concealed the existence of the inflated and fraudulent nature of these list price increases as well as the existence, amount, and purpose of the discounts given to the PBM Defendants to Plaintiff, the Classes, consumers, health care payers, and the general public. Specifically, Defendants claimed that the rebates paid to the PBM Defendants were for the purpose of lowering drug costs when, in fact, they were quid pro quo payments for formulary access that had the opposite effect for Plaintiff and the members of the Classes.

181.   Each Defendant and member of the Enterprise benefited financially from the Enterprise. The Defendants received direct rebate payments from Mylan N.V., Mylan Specialty L.P., and Mylan Pharmaceuticals, Inc. ("Mylan"), a large portion of which they pocketed as pure profit, as well as other fees. In exchange, one or more of Mylan's EpiPen products received a favorable position on one, or a number, of the PBM Defendants' formularies, translating into higher sales and profits for Mylan. And because Mylan financed the payment of rebates by inflating the list prices of the EpiPen, they maintained and, in some cases, increased their profit margins.

182.   The Defendants and their co-conspirators, including Mylan, through the illegal RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Defendants, Mylan, and the other entities and individuals associated-in-fact with the RICO Enterprise's activities through the illegal scheme to sell EpiPen epinephrine injectors at an inflated and artificial price.

183.   The RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the

marketing, promotion, advertisement, distribution, and sale of EpiPen products throughout the country, and the receipt of monies from the sale of the same.

184.    Within the RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. Defendants and their co-conspirators used this common communication network for purposes of marketing, pricing, and engaging in negotiations regarding EpiPen products, their pricing, and placement or position on the PBM Defendants' formularies, and for furthering the RICO Scheme.

185.    Each participant in the RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the RICO Enterprise, the Defendants and their conspirators functioned as a continuing unit with the purpose of furthering the RICO Scheme. There is also regular communication between Mylan and each of the PBM Defendants, through which information was shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Mylan and the PBM Defendants share information regarding the list price of the EpiPen and discuss and agree on rebate amounts. Mylan and the PBM Defendants functioned as a continuing unit for the purposes of implementing this pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

186.    Defendants and Mylan participated in the operation and management of the RICO Enterprise by directing its affairs, as described herein. While Mylan and Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

187.    Mylan and the Defendants exerted substantial control over the RICO Enterprise, and participated in the affairs of the enterprise by: (a) negotiating and/or offering discounts for Mylan's EpiPen products; (b) misrepresenting and/or concealing the existence, amount, or purpose of the discounts negotiated for EpiPen products; (c) misrepresenting and/or concealing the effect that the negotiated discounts had on the price of the EpiPen for the end payer; (d) negotiating and/or setting the list price for EpiPen products; (e) misrepresenting and/or concealing the true cost of the EpiPen; (f) publishing, reproducing, and/or distributing documents containing the list price of the EpiPen and raising those prices as necessary; (g) negotiating and/or offering preferred formulary placement for the EpiPen; (h) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the enterprise and its effect on the pricing of the EpiPen; (i) otherwise misrepresenting and/or concealing the inflated and fraudulent nature of the pricing of the EpiPen; (j) collecting discounts, revenues, and/or profits from the sale of the EpiPen; (k) ensuring that the other Defendants and members of the RICO Enterprise complied with and concealed the fraudulent scheme.

188.    Without each Defendant and co-conspirator's willing participation, the RICO Scheme and common course of conduct would not have been successful. At all relevant times, Defendants and Mylan were aware of each-other's conduct, were knowing and willing participants in the RICO Enterprise, and reaped profits from its conduct.

189.    Mylan struck rebate deals with the PBM Defendants to conceal the true price of its EpiPen products and allowed the Defendants to profit from the payment of inflated rebates. The PBM Defendants represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiff and the members of the Classes) money on their prescription needs. But it knew that the rebates did not actually decrease the costs of EpiPens for

consumers. The published list price for EpiPens was falsely inflated, the PBM Defendants (and insurers) pocketed substantial portions of the rebates paid by Mylan instead of passing the savings through to consumers, and PBMs, on behalf of their insurer clients, were calculating pre-deductible and coinsurance obligations based on the inflated list price. Each of the Defendants and Mylan also knew, but did not disclose, that the other Defendants and members of the RICO enterprise were engaged in the same rebating scheme, to the detriment of consumers. But for the RICO Enterprise's unlawful fraud, each Defendant and member of the RICO Enterprise would have had the incentive to disclose the deceit, thereby forcing competition on net price. By failing to disclose this information, the PBM Defendants and Mylan perpetuated the RICO Enterprise's scheme, and reaped substantial profits.

190.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of EpiPen autoinjectors, the PBM Defendants did not challenge Mylan's reported list prices, terminate their role in the RICO Enterprise, or disclose publicly that the EpiPen list prices did not accurately reflect the price actually paid.

191.    Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

**D.    Predicate Acts: Mail and Wire Fraud**

192.    To carry out, or attempt to carry out, the scheme to defraud, the Defendants and their co-conspirators including Mylan, each of whom is a person associated-in-fact with the RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

193.    Specifically, Defendants and their co-conspirators including Mylan have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

194.    The multiple acts of racketeering activity which Defendants and their co-conspirators including Mylan committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the RICO Enterprise. Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

195.    Defendants and their co-conspirators including Mylan used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions. The PBM Defendants and their co-conspirators including Mylan knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding: (a) the actual net prices of EpiPen products; (b) the extent to which the actual net prices departed from the published, artificially-inflated list prices; (c) the extent to which Mylan and the PBM Defendants had negotiated the rebates discounting the list prices of the EpiPen in good faith and for a proper purpose; (d) whether the rebates were intended to benefit health care payers, plan members, and/or the general public; (e) whether the rebates saved health care payers, plan members, and the general public money; (f) whether the "preferred" formulary status of the EpiPen auto-injector reflected the drug's safety, efficacy, or cost-effectiveness; (g)

Whether the EpiPen auto-injector would have been placed in a "preferred" formulary position absent the rebates paid by Mylan; and (h) the extent to which the rebating scheme would force plan members to incur additional expenses for their EpiPen prescriptions.

196.    In devising and executing the illegal scheme, Defendants and their co-conspirators including Mylan devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and the Classes or to obtain money from Plaintiff and the Classes by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the Defendants and their co-conspirators committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

197.    Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a) <u>Mail Fraud</u>: Defendants and their co-conspirators including Mylan violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, price, and/or sell the EpiPen epinephrine injector products described herein by means of false pretenses, misrepresentations, promises, and omissions.

(b) <u>Wire Fraud</u>: Defendants and their co-conspirators violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

198.    Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of marketing or other materials indicating, setting, or negotiating the price of EpiPen auto-injector products; (b) the transmission of marketing or other materials indicating or advertising that any of the PBM Defendants reduce the price of the EpiPen; (c) written, telephone, or electronic communications regarding and/or negotiating the price of the EpiPen; (d) written, telephone, or electronic communications regarding and/or negotiating discounts and/or rebates for

EpiPen products; (e) written, telephone, or electronic communications regarding the existence, amount, or purpose of discounts and/or rebates for EpiPen products; (f) the transmission and/or distribution of EpiPen products through the mails; and (g) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of EpiPen products.

199.    Defendants and their conspirators, including Mylan, also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

200.    The mail and wire transmissions described herein were made in furtherance of Defendants' RCIO Scheme and common course of conduct designed to increase the cost of the and fraudulently extract hundreds of millions of dollars of revenue from Plaintiff and the Classes.

201.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the RICO Scheme, including the things and documents described above.

202.    Defendants and their co-conspirators including Mylan have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the Defendants in these offenses and have performed acts in furtherance of the conspiracy to

increase or maintain revenues, increase market share, and/or minimize losses for Defendants and their co-conspirators throughout the illegal scheme and common course of conduct.

203.    Mylan alone could not have accomplished the purpose of the RICO Enterprise without the assistance of Defendants. For Mylan to profit from the scheme, the PBM Defendants needed to convince health care payers and plan sponsors to select their formulary, on which Mylan's EpiPen epinephrine injector products were given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts. However, these discounts were only significant because the list prices were artificially inflated. The discounts were fictitious: the result of a deliberate scheme to create large rebates without lowering net prices. And, contrary to their representations, the rebates benefitted the PBM Defendants by allowing them to pocket a significant portion of the rebates as a kickback. Without these misrepresentations, the RICO Enterprise could not have achieved its common purpose.

204.    Defendants, further, aided and abetted others in the violations of the above laws. Defendants hid from Plaintiff, the Classes, insurers, health plans, and the general public the true net price of EpiPen epinephrine injector products described herein, the inflated and fraudulent nature of the list price of EpiPen epinephrine injector products, the relationship between the Defendants, their co-conspirators, and its impact upon the price of EpiPen epinephrine injector products, as well as the existence, amount, and purpose of rebates and discounts given for EpiPen epinephrine injector products, and the portion of the rebates and discounts pocketed by Defendants.

205.    Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct.

Indeed, for the conspiracy to succeed, each of the Defendants and their co-conspirators, including Mylan, had to agree to conceal their fraudulent negotiations and pricing tactics.

206.    Defendants and their co-conspirators, including Mylan, knew, and intended that, Plaintiff and the members of the Classes would rely on the material misrepresentations and omissions made by them and would incur increased costs as a result. Indeed, if Plaintiff and the Classes did not make inflated payments for EpiPen auto-injector products, the RICO Scheme could not succeed.

207.    As described herein, Defendants and Mylan engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiff and the Classes through their misrepresentations and omissions, while providing EpiPen epinephrine products that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

208.    During the Defendants' determination of discounts and/or rebates for the EpiPen epinephrine injector products described herein, the true purpose of the discounts, the true cost of the EpiPen epinephrine injectors, and the inflated and fraudulent nature of their pricing was revealed to each of the Defendants and their co-conspirators. Nevertheless, Defendants and their co-conspirators, including Mylan, continued to disseminate misrepresentations regarding the true cost of EpiPen auto-injectors as well as the existence, amount, and purpose of the discounts on those products, in furtherance of the RICO Scheme.

E.    **Damages Caused by the RICO Enterprise**

209.    By reason of, and as a result of, the conduct of the Defendants and their co-conspirators, and in particular, their pattern of racketeering activity, Plaintiff and the Classes have

been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated prices for the EpiPen epinephrine injector products described herein.

210.    Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and the members of the Classes who are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT II — PURSUANT TO ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3) FOR VIOLATIONS OF ERISA § 406(b), 29 U.S.C. § 1106(b)

(By Plaintiff on Behalf of all Members of the ERISA Class, Against Prime Therapeutics LLC)

211.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

212.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

213.    As alleged above, Prime Therapeutics LLC is a fiduciary to Plaintiff's ERISA Plan and the ERISA Plans of the members of the ERISA Class. It violated all three subsections of ERISA § 406(b).

214.    As alleged above, both (i) payments from participants and beneficiaries and (ii) the contracts underpinning the ERISA Class members' ERISA Plans are plan assets under ERISA.

215.    First, by setting its own compensation from EpiPen epinephrine injector prescription payments from participants and beneficiaries, as well as from ERISA Plan contributions, collecting their own compensation from those same sources, and managing

pharmacy benefits in their own interest or for their own account, Prime Therapeutics LLC violated ERISA § 406(b)(1). Specifically, in setting the amount of and taking undisclosed payments, often in the form of PBM Kickbacks, Prime Therapeutics LLC dealt with Plaintiff's and the members of the ERISA Class' ERISA Plans and with the ERISA Plans' plan assets in its own interest and received plan assets and consideration for its personal accounts. Further, by inducing Mylan N.V., Mylan Specialty L.P., and/or Mylan Pharmaceuticals, Inc. (collectively, and the purposes of this and the following ERISA counts, the "Mylan") to inflate list prices for EpiPen epinephrine injectors to accommodate its demands for kickbacks, Prime Therapeutics LLC dealt with Plaintiff's and the members of the ERISA Class' ERISA Plans and the plan assets of those ERISA Plans in its own self-interest, rather than in the interest of ERISA Plan participants and beneficiaries.

216.    Second, by acting on behalf of Mylan, who also stood to profit from inflated EpiPen epinephrine injector prices at the expense of Plaintiff and the members of the ERISA Class—and thus had interests adverse to the affected participants and beneficiaries— Prime Therapeutics LLC engaged in conflicted transactions each time they facilitated, required, or allowed EpiPen epinephrine injector price inflation and/or the payment of PBM Kickbacks, in violation of ERISA § 406(b)(2). Under this subsection of ERISA § 406(b), plan assets need not be involved—dealing with an ERISA Plan is enough.

217.    Third, Prime Therapeutics LLC received consideration for its own personal accounts from other parties—including Mylan, third parties, Plaintiff, and the members of the ERISA Class—that were dealing with ERISA Plans in connection with transactions involving the assets of ERISA Plans.

218.    Prime Therapeutics LLC's prohibited transactions described herein not only profited Prime Therapeutics LLC, but also injured Plaintiff and the members of the ERISA Class, who have suffered losses through the PBM Kickbacks that Prime Therapeutics LLC took through these prohibited transactions.

219.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." Plaintiff and the ERISA Class' § 502(a)(3) claims are on behalf of *all participants and beneficiaries* of ERISA Plans whose pharmacy benefits are managed and administered by Prime Therapeutics LLC, regardless of the type of ERISA Plan it is and whether or not it is underwritten by an insurance contract with a health insurer, to recover the portions of their copayments, coinsurance, and deductible amounts paid for EpiPen epinephrine injector products at an inflated price due to the PBM Kickbacks described herein.

220.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to the Plaintiff and the members of the ERISA Class, including but not limited to:

A.    an accounting;

B.    a surcharge;

C.    correction of the transactions;

D.    disgorgement of profits;

E.    an equitable lien;

F.    a constructive trust;

G.    restitution;

       H.      full disclosure of the foregoing acts and practices;

       I.       an injunction against further violations; and/or

       J.      any other remedy the Court deems proper.

### COUNT III — PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) FOR VIOLATIONS OF ERISA § 404, 29 U.S.C. § 1104

(By Plaintiff on Behalf of all Members of the ERISA Class, Against Prime Therapeutics LLC)

221.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

222.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

223.    In leveraging its access to millions of dollars in EpiPen purchases through ERISA Plans to which it had access and over whose plan assets it had or exercised control for its own benefit or the benefit of third parties, and to the detriment of participants and beneficiaries Prime Therapeutics LLC breached its fiduciary duties of loyalty and prudence.

224.    Further, in failing to put the interests of participants and beneficiaries first in managing and administering pharmacy benefits, Prime Therapeutics LLC breached its fiduciary duty of loyalty. And in acting in its own self-interest and in the interest of their own corporate affiliates, Prime Therapeutics LLC violated the "exclusive purpose" standard.

225.    The duty to disclose is part of the duty of loyalty. In concealing and failing to disclose to the ERISA Class the fact or amount of the PBM Kickbacks, the inflation of list prices,

or the net price of EpiPen auto-injector products for which they were being charged, and in concealing and failing to disclose to Plaintiff and the ERISA Class that plan participants were paying inflated amounts for copayments and coinsurance, as well as deductible payments, Prime Therapeutics LLC breached this duty. Further, both omissions and misrepresentations are actionable under ERISA's disclosure obligations, and the type that occurred here are not subject to individualized reliance requirements.

226.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan. In so doing, Prime Therapeutics LLC violated its duty of prudence.

227.    Plaintiff and the members of the ERISA Class have been damaged and suffered losses in the amount of the PBM Kickbacks Prime Therapeutics LLC took.

228.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

229.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to the Plaintiff and the ERISA Class, including but not limited to:

    A.    an accounting;

    B.    a surcharge;

    C.    correction of the transactions;

    D.    disgorgement of profits;

    E.    an equitable lien;

    F.    a constructive trust;

G.    restitution;

H.    full disclosure of the foregoing acts and practices;

I.    an injunction against further violations; and/or

J.    any other remedy the Court deems proper.

## COUNT IV — PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) FOR VIOLATIONS OF ERISA § 702, 29 U.S.C. § 1182

(By Plaintiff on Behalf of all Members of the ERISA Class, Against Prime Therapeutics LLC)

230.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

231.    ERISA § 702, 29 USC § 1182, states in pertinent part:

Prohibiting discrimination against individual participants and beneficiaries based on health status.

(a) In eligibility to enroll.

(1) In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

A.    Health status.

B.    Medical condition (including both physical and mental illnesses).

C.    Claims experience.

D.    Receipt of health care.

E.    Medical history.

F.    Genetic information.

G.    Evidence of insurability (including conditions arising out of acts of domestic violence).

H.    Disability.

(2) No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

(A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or

(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3) Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1) In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

232.    In setting the price for EpiPen auto-injector products and taking excessive and undisclosed rebate and other kickback payments, Defendants have required plan participants and beneficiaries who have a medical condition that requires an EpiPen subject to Defendants' artificially inflated prices and undisclosed and excessive PBM Kickbacks to pay greater premiums and contributions for their health plan benefits than those participants and beneficiaries who do not.

233.    Under Defendants' scheme, Plaintiff and members of the ERISA Class who need prescription EpiPen auto-injector products subject to Defendants' artificially inflated prices and undisclosed and excessive PBM Kickbacks were required to pay hidden additional and/or higher premiums in order to be able to use their benefits as enrollees, thus making the artificially inflated prices and payment of PBM Kickbacks a condition of continued enrollment under their ERISA

Plans. Without paying inflated copayments, coinsurance, or deductible payments, above and beyond the required participant contributions set forth in their plans, Plaintiff and members of the ERISA Class could not obtain covered prescription medications under their ERISA Plans, the effect of which is that they would not be enrolled in the Plans.

234. Plaintiff and the ERISA Class have been damaged and suffered losses in the amount of the PBM Kickback Prime Therapeutics LLC took, which were financed by the inflated costs paid by Plaintiff and the ERISA Class for prescription EpiPen auto-injector products.

235. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

236. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to the Plaintiff and the ERISA Class, including but not limited to:

    A.    an accounting;

    B.    surcharge;

    C.    correction of the transactions;

    D.    disgorgement of profits;

    E.    an equitable lien;

    F.    a constructive trust;

    G.    restitution;

    H.    full disclosure of the foregoing acts and practices;

    I.    an injunction against further violations; and/or

    J.    any other remedy the Court deems proper.

## IX.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of the proposed Classes, respectfully demand that this Court:

A.      Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (b)(1), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Classes, and declare Plaintiff as the representatives of the Classes she seeks to represent, and appoint her attorneys as Class Counsel;

B.      Enter judgments against Defendants and in favor of Plaintiff and the Classes for violations of the laws and legal standards invoked herein;

C.      Award preliminary and permanent injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Classes, including, inter alia, an order prohibiting Defendants from engaging in the unlawful acts described above; an order requiring Defendants or their agents to disclose the existence and/or amount of any rebates, discounts, fees, or other payments received by the PBM Defendants for including EpiPen epinephrine injector products on any formulary, and an order requiring Defendants or their agents to disclose the true net price of EpiPen epinephrine injector products.

D.      Find that Prime Therapeutics LLC is a fiduciary and/or parties in interest as defined by ERISA;

E.      Find that Prime Therapeutics LLC violated its fiduciary duty of loyalty and prudence to ERISA Class members, and that it engaged in prohibited transactions in violation of ERISA;

F.      Award to the Plaintiff and the ERISA Class restitution, surcharge, and/or other appropriate equitable relief, including, without limitation, disgorgement of all profits

and unjust enrichment that Defendants obtained from the Plaintiff and the members of the ERISA Class, as a result of the Defendants' unlawful actions;

       G.     Order other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the ERISA Class and the appointment of independent fiduciaries to serve in the roles that Prime Therapeutics LLC occupied with respect to the ERISA Plans of the ERISA Class, including as pharmacy benefit administrator and manager;

       H.     Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

       I.     Award the Classes damages (i.e., three times overcharges) in an amount to be determined at trial;

       J.     Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law, including under RICO, ERISA, and the common fund doctrine;

       K.     Find that Defendants are jointly and severally liable for all claims;

       L.     Order that Defendants must notify each and every individual who paid a copayment or coinsurance for covered prescription drugs that exceeded the true cost of the drug about the pendency of this action so that they may obtain relief from Defendants for their harm; and

       M.     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

# X.    JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff, on behalf of the proposed Classes, demand a trial by jury on all issues so triable.

DATED: August 11, 2017

Respectfully submitted by,

   /s/ Rex A. Sharp
Rex A. Sharp KS #51205
REX A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, KS  66208
(913) 901-0505
(913) 901-0419 Fax
rsharp@midwest-law.com
rhudson@midwest-law.com

Lynn Sarko, *pro hac vice forthcoming*
Derek W. Loeser, *pro hac vice forthcoming*
Gretchen Freeman Cappio, *pro hac vice forthcoming*
Gretchen S. Obrist, *pro hac vice forthcoming*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900
(206) 623-3384 Fax
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com
gobrist@kellerrohrback.com

Warren T. Burns, *pro hac vice forthcoming*
BURNS CHAREST LLP
500 North Akard, Suite 2810
Dallas, TX 75201
(469) 904-4550
(469) 444-5002 Fax
wburns@burnscharest.com
scox@burnscharest.com

W. Mark Lanier *pro hac vice forthcoming*
THE LANIER LAW FIRM
6810 FM 1960 West
Houston, TX 77069
(713) 659-5200
WML@LanierLawFirm.com
Reagan.Bradford@LanierLawFirm.com
Cristinaldeslise@LanierLawFirm.com

**ATTORNEYS FOR PLAINTIFFS**